22-2079. Please counsel, for the appellant, yes, please approach and proceed. May it please the court. Your Honor, there are several issues raised in our briefing in this matter, but what I want to focus on, what I want to focus the court on today is the due process issues and the perfect storm that created, that was created by the District Court below to the result of the respect to the defense's presentation of its case. When we look at a due process, when we look at the due process issues in this case, I would like to focus the court on that the government bears the burden to negate any reasonable interpretation of a regulatory regime that would make defendant's conduct not criminal and negate intent. Well, are we focused right now on substantive due process? Well, there's a combination of substantive and procedural due process issues in this case, Your Honor. Well, let's take them one at a time. Let's start with substantive. As far as the substance goes, I would point the court to two issues. Well, I'm going to ask you what I want you to point me to.  If we're arguing substantive due process, I want to know where in your opening brief you told us what fundamental liberty interest we're talking about, or alternatively, what conduct of the government do you assert shocks the consciousness? Well, Your Honor, the due process arguments find their expression in what we raised about the court's treatment of the motion to dismiss. A vague objection to how the court treated a motion to dismiss is not a substantive due process argument. Substantive due process has particular, I guess I'll call them elements, and I don't see anywhere in your briefing where you've even explained how what you're arguing fits in the framework of the substantive due process. Well, Your Honor, the substantive due process takes, we've cited the Simmons case and we've cited the Medeiros case. In Medeiros, this court made clear that fair warning of what was criminal in the context of- Now you're arguing ex post facto? Well, there's a combination of substantive due process and ex post facto with respect to Medeiros. Because we have the government's reinterpretation after the fact of what was criminal in the context of congressional liaison activities or lobbying, and we also have- Well, on ex post facto, I don't see even a cite to the ex post facto clause in the opening brief. I mean, I found it very difficult to follow your constitutional arguments because they really weren't tethered to any expression of what it takes to make such an argument. And I'm inclined to think you forfeited your ex post facto argument. Well, Your Honor, I mean, I think we raised, I think we pointed out in our reply brief where we raised those issues with the court. And we, in the motion to dismiss, those arguments were certainly raised in terms of the application or the reinterpretation of the lobbying statute and how the government basically has charged the lobbying statute as fraud in this instance. And so if we get over my concerns with adequate briefing and we go to the merits, the biggest problem that I see is that there's no charge for violating the lobbying statute. It's not the charge. That's not what this case is about. Well- It's about fraudulent payment requests. Well, Your Honor, but there's no proof that Mr. Booty himself was involved in any of the fraudulent payment requests at all. That's a different argument than ex post facto. So what the government's argument is in its opposition brief is that if you take, you know, even absent the proof that Mr. Booty was involved in allocating the money or reviewing or formulating the invoices or reviewing them or even recommending their payment to the government, what they say is that under any interpretation of the law here that it would, that it would, the invoices would have to be fraudulent because they were asking for Mr. Lowe to be paid as a lobbyist. Now, in terms of whether this is an anti-deficiency act violation or whether this is a complex scheme or whether this has several issues with respect to how is that interpreted, it is the government's burden up front, which was shifted to the defense- They were asking Mr. Lowe to be paid for something he didn't do. He could have done anything. It just so happened that he did lobbying, but they were asking, these invoices were being submitted under the pretense that he was doing something he wasn't doing. Yeah, but, Your Honor, in Mr. Diaz's testimony, he testified, and there's no proof otherwise, that Mr. Booty knew that the invoices were inflated or that they were mapped or any of that aspect. There's no evidence in the record that Mr. Booty knew what money was allocated to these contracts. Was there evidence in the record that he knew that they were going to be paying Mr. Lowe? Well, there was evidence of that. And he knew what Mr. Lowe was supposed to be doing to get paid, right? Yes, Your Honor, the lobbying aspect. He knew that Mr. Lowe was going to be lobbying. He knew that these companies were paying Mr. Lowe, and presumably he knew that the companies could not have been paying him to lobby. So what difference does it make what the lobbying statute is? I mean, you could- let's take another scenario. You had a guy who was building aircraft assembly engines for the company. Mr. Booty says, okay, well, we want these engines, you know, but we can't afford to get them right now. So you two companies, I want you to pay him for something, something else. I know that he's giving us aircraft engines. I want you to pay him for something else. It doesn't matter whether there's lobbying. You've got a false claim that is made involving the government to defraud the government. What difference does it make? Well, that does make a big difference, Your Honor. The context of whether it's illegal lobbying, you know, it's not- lobbying per se is not- there's no fair notice of lobbying per se as a crime. There's no absolute prohibition on lobbying. The point I'm trying to make with my awkward hypothetical is simply the notion that you take any other activity, they're paying him for some other activity than on the books it appears they're paying him for, and you've got a crime. It doesn't matter whether the other activity is aircraft engines. It doesn't matter whether the other activity is lobbying. It doesn't matter what the other activity is. All this says is you cannot falsify what you were seeking payment for. It doesn't matter what it is. Well, Your Honor, Mr. Booty did not falsify anything in invoices. Was Mr. Booty charged in a conspiracy? Yes, he was charged in a conspiracy, and other people did that, but there was no evidence that he knew about that. And so the only thing we're left with at that point is whether paying Mr. Lowe under any circumstances for congressional liaison activities or sustainment activities was illegal, or that he was told up front that it was. When you look at the contract in this case, the contract specifically said that congressional liaison activities and sustainment activities on behalf of the Big Crow Program, which is a fee-for-service agency and not a normal executive branch agency, was allowed. Under that contract, there's no testimony from Ms. Golden, who was the contracting officer at the time, that she had a conversation with Mr. Booty to say that congressional liaison activities includes this and not this, that sustainment activities includes this and not this. So there was no fair notice up front at all about what was contemplated. The government was allowed, after the fact, to introduce Ms. Golden's testimony, Mr. Brennan's, and Mr. Larson's, to say what they meant by that after the fact without providing any proof that Mr. Booty was told that up front. That he was told you can't hire a lobbyist? Well, yes. But did someone have to tell him you can't falsify your request for payment to the government? But, Your Honor, he didn't do that. There's no proof tying him to that. I don't see that you've made an argument of insufficiency of the evidence. Oh, yes, Your Honor. We didn't have to because it wasn't there. Well. I mean, you know, we did make the argument in our briefs. He's got a challenge. You've got a challenge, sufficiency of the evidence. I did challenge the government's assertion that there was proof that Mr. Booty knew about any of that. And have you raised, more to the point, have you raised the sufficiency of the evidence challenge on appeal? Well, challenge of sufficiency of evidence about that he was of that aspect? A sufficiency of the evidence to convict him of the crimes with which he was charged. Oh, yes, Your Honor. I mean, you know, we've. . . That was one of the issues that we've raised in this matter. It's not in your statement in the issues of your brief. It's not in a separate section of your brief. This is the first time I'm seeing it. Well, Your Honor. Your Honor. You're saying we should be able to interpolate that that's what you meant, but from taking your argument on other points. Is that. . . Well, Your Honor, I don't think I have to. . . I don't think I have to challenge when there's no proof on it. Oh, you absolutely do. I did say in the brief. That's the way it works. I did say in our brief specifically. And I pointed to the testimony of Mr. Diaz throughout. That there is absolutely no proof that Mr. Booty was involved in allocating the money to the contract. That he was involved in formulating any of the invoices, reviewing them. And he never even saw any of them. I beg to differ, sir. If you're going to make a legal argument that is predicated on a challenge, a tacit challenge to the facts, it can't be tacit. You've got to make that challenge. Because the legal argument you're making is predicated on challenging the jury's finding of guilt of the things. . . Of the false claims that he was charged with. The conspiracy to be involved in the false claims he's charged with. And if you didn't challenge that, we've got to go with the facts that the jury found. And then does your legal argument hold up? And you've got to help us to show how. Your Honor, there's no facts found and there's no evidence on the record. And I say this on page 10 of my opening brief. That Mr. Booty never knew that the invoices were inflated. Saying that on page 10 of your opening brief is not raising it as an issue on appeal. Well, Your Honor, I was focused on the due process argument in this case. And so what we're talking about is that when we look at our reply brief at pages 5 through 8, we talk about two aspects that I raised in the Simmons case and in the Medeiros case. One is that there's a complex regulatory scheme here that we were supposed to be able to elucidate on and supposed to be able to express at trial. In the record at volume 10, appendix 10, I have a colloquy with the court in that portion where we talk about this. We talk about we need to be able to show custom and practice issues. We need to be able to show that lobbying is not illegal in this context. And the court, both in its motion to dismiss and later in the trial, shifted the burden of proof to the defense on all those things. More to the point, didn't the court say explicitly that lobbying is not the issue here? That whether he was guilty of lobbying or not was not the issue. That was not what this case is about. The court expressly said that, did it not? Well, Your Honor, if you read page volume 10, appendix 12, here's the colloquy. Mr. Baines, Your Honor, you have already let them say that lobbying is illegal to the jury. The court, well, I let you say it wasn't illegal. And then I said, and so we are able to go back and forth on this as a matter of fact and in terms of how it was construed at the time. Ultimately, what I said on page 16 of the same colloquy is that the jury has to understand what Mr. Booty understood at the time and what he was told or what type of framework he was operating in. The court conceded during the same colloquy that this was a complex area. Let me just back up for a quick second. At one point early on, you said that, at least as I understood you, there was a merger of the ex post facto and due process argument. And at least to my ear, that struck me as strange. But didn't the Supreme Court say that if there is a specific constitutional right that you can proceed on, that invoking substantive due process is not appropriate? That's my understanding. Do you have a different view? And if you do, what law do you have for that? In other words, if you do have an ex post facto claim, that is the claim, is it not? Well, we have two separate claims, Your Honor. We had expressed it as an ex post facto claim because of the way the government reinterpreted the lobbying, the prohibitions on lobbying in the context of the complex federal scheme. And, you know, the court shifted those burdens and made them affirmative defenses and then precluded us from talking about it and introducing Mr. Magnuson's testimony. I guess my question was, as a categorical matter, if you have an ex post facto claim, how is it appropriate to merge that with the substantive due process claim? Well, I think it's all a violation of due process to apply ex post facto interpretations of a statute or of a statutory prohibition. Because it's not fair? Well, because it violates due process, because it's a reinterpretation of what the law was at the time. Well, then it violates ex post facto. Yes, Your Honor. Which is different than due process. Well, but the due process elements are what we've said. We've also raised the due process elements, and that includes, you know, the administrative requirements that there be a fiscal law investigation and finding up front, similar to what we had in Simmons and what we've raised in our briefs. And then secondly, that there be fair notice and an opportunity to present that there are alternative interpretations of this regulatory regime. There's no elegant way to stop you, so I'm going to need to stop you. I'm sorry, Your Honor. All right. Thank you. Counsel, I'm Assistant U.S. Attorney Jeremy Pena, and I represent the United States at both the appellate and trial level in the matter of the United States v. Milton Booty. Appellant presents more than a dozen issues for this court to consider in his briefs, including the reply brief. Each issue suffers from many of the same deficiencies, deficiencies in briefing, citation, and overall framing for this court to analyze the issue or even to discern which exact issue is being raised. Furthermore, as to the evidentiary issues, Mr. Booty does not argue cumulative error, and so each of those evidentiary issues must be considered in isolation. And most importantly, as Your Honors were presenting to appellant's counsel, he does not challenge, he does not present a framed-up challenge to the sufficiency of the evidence overall. Furthermore, for the duration of trial and all the way up to and including the reply brief, he has not provided a succinct defense theory of the case that this court could use to analyze the government's harmless error arguments. He does not object to the jury instructions either, and so the notion, the allusion to burden shifting is simply not before the court either. At trial, the government presented evidence that in 2004, Mr. Booty, the program director of the Big Crow Program Office, circumvented the entire federal procurement process to make a handshake agreement with George Lowe. At a time when Big Crow had no funds available, Mr. Booty promised to pay Mr. Lowe $15,000 a month to lobby Congress to direct funding to Big Crow. And when George Lowe succeeded, Mr. Booty promised him a bonus of 10% of the newly appropriated funds. Now, I'd like to turn the court's attention to the multiple theories of illegality that the United States very clearly presented to the jury, and these are also very clearly stated in the response brief. Mr. Booty's agreement with Mr. Lowe was improper for the following reasons. First, he never commemorated the agreement in writing at all. This was purely an oral handshake agreement, and I'd also direct the court's attention to the concession that appellant's counsel made on the record regarding that illegality. In the response brief at page 47, Mr. Baines said to the court, you know, Mr. Magnuson, the Crawford defense expert, is not going to say that an oral contract is enforceable ever. And so, and you know, if they're able to prove that he, that Mr. Booty entered into an oral contract with Mr. Lowe, if the jury buys that, you know, and that he actually worked that summer, you know, at all, which Mr. Guerin said no, I mean, if the jury buys that, then, you know, that would be a, that would, Mr. Magnuson would even agree that that would be an illegal contract. The second theory that the United States presented was that Mr. Booty circumvented the entire federal procurement process in retaining Lowe. The third theory was that Mr. Booty was not a contracting officer and therefore lacked authority to enter into a payment agreement on behalf of the government. The fourth theory was that there was no funding in place at the time of the Mr. Lowe's performance of work on the agreement. The fifth theory was that the payment terms were totally foreign to federal procurement practices. Only the sixth theory of illegality was that the agreement was for lobbying services, which are closely scrutinized in federal contracts. You talk about these theories, but in fact, isn't this just a false claim matter? So these theories actually play into what the defendant wants to do, which is talk about what procurement law is. That doesn't really matter, does it? What matters is I submitted a claim to pay X, which was not for X. That's it, right? Yes, Your Honor, and the court properly instructed the jury not to consider whether the lobbying was in fact legal or illegal and explained to the jury that those theories of illegality and the lobbying are only to be considered for the defendant's motive, intent, knowledge, et cetera, in requiring other people to formulate fraudulent invoices. And that's the way you're presenting those theories here, right? Yes. Okay. Yes. So ultimately, those were reasons that it was incontrovertible that the defendant, Mr. Booty, knew that there was not a legal way to pay on this agreement, and yet he forced his contractors to pay on this agreement. So those theories show that Mr. Booty knew what he was doing was illegal and was going to result in fraudulent invoices when he directed those contractors to pay George Lowe. As to the due process issue that was discussed in appellant's part of the argument, Your Honor. Let me be clear on this. You're saying that because of those theories, he knew there wasn't a legal way to pay Mr. Lowe. I thought, and perhaps misunderstood, that essentially the kernel here is that there were invoices submitted that were designed to pay Mr. Lowe,  and Mr. Booty also understood that he was going to pay Mr. Lowe for doing something else. Absolutely, Your Honor. Up until the last moment, and I would agree that the defense is correct when they say that the United States did not present evidence that Mr. Booty saw the fraudulent invoices himself. Well, he didn't have to see them. Did he know that these entities were paying Mr. Lowe for things that were not what Mr. Lowe was doing for Mr. Booty? Yes, absolutely. Okay. And I guess what I'm saying is if it is essential that he know that there was no legal way to pay Mr. Lowe, doesn't that get you into whether in fact the procurement regulations would allow Mr. Lowe to be paid for the activities that he engaged in, whether Mr. Lowe could be paid for lobbying? Doesn't it get you into all of that? Not deeply, Your Honor, because of the overwhelmingly illegal nature of the agreement. You don't need an expert to say a handshake agreement is not enforceable in federal contracting law. Everyone knows that. Every single witness understood that. Defense witnesses testified to that. The multiplicity of theories of illegality just underscore the fact that it is not a matter of technical contracting interpretation. All right. It doesn't matter what the subject of your handshake agreement is. It still violates the government procurement rules. Correct. Absolutely, Your Honor. Mr. Lowe could have been performing, as Your Honor suggested, engineering services. It didn't matter. The government's case would have changed only in a tiny degree. The jury instructions would have been the same. The verdict would have been the same.  I'll cede back the remainder of my time. Thank you. Thank you. Case is submitted. Thank you, counsel.